## BALTIC COTTON CO., Inc., v. UNITED STATES.

### No. 2063.

District Court, S. D. Alabama, S. D.
May 16, 1931.

Harry T. Smith & Caffey, of Mobile, Ala., for libelant.

Wm. B. Inge, C. C. Inge and Alex C. Birch, U. S. Dist. Atty., all of Mobile, Ala., for the United States.

ERVIN, District Judge.

This matter comes on to be heard on exceptions to the master's report. The facts are that Weil Bros. sold a lot of 300 bales of cotton to the Baltic Cotton Company, and undertook to ship the same from Mobile by one of the Shipping Board vessels. When the cotton was tendered to the vessel for shipment, objection was made to the issuance of clear bills of lading because the bales were wet; the vessel claiming that they must note this fact upon the bills. Weil's agent then agreed that, if they would issue clear bills, Weil Bros. would indemnify them against any loss or claim of damage by reason of the issuance of the clear bills, and, under this agreement, clear bills were issued. Weil delivered these bills and was paid the purchase price on the faith of the bills. When the cotton reached Copenhagen, it was discovered by the purchaser that it was damaged by water, and they, assuming that this water damage was suffered while in transit, asked for an adjustment of this damage by the Sea and Commerce Court, which appointed appraisers to ascertain the damage. No notice was given to Weil Bros. of this examination. The appraisers examined the cotton, divided it into a number of classes according to the extent of the damage, and ultimately selected three of the damaged classes, estimating the extent of the damage in each of these classes. They then took the average of these three classes of damaged cotton and applied this average to the whole lot of 300 bales and found in this way the damage to be 14.5 per cent. of damage.

It appears that the Baltic Cotton Company, the libelant, separated the damaged cotton, or pickings, from that which was good, and sold the good cotton to some one of their customers. What they did with the pickings is not shown; one of the witnesses stating that they were thrown away, but that must be an error, for, even though damaged, it had some value. When the libelant discovered that their claim was not against the insurance company, but that the cotton was wet when shipped, they notified Weil Bros., who immediately asked that the pickings be kept for examination by a member of their firm, who would shortly come over, and who would undertake to adjust the loss with them. This was not done, and, when a member of the firm called on them, one exhibited to him a sample taken from one bale and said they could not find the balance of the damaged cotton. After the libel was filed, interrogatories were filed to libelant's seeking to ascertain who the purchaser of the good cotton was, and the weight of the cotton which was ascertained to be good, and the weight of that portion of the cotton which was ascertained to be bad. The libelants first declined to answer these interrogatories because that was a trade secret. The court overruled that contention and required an answer. In the meanwhile, the testimony of the libelant's auditor was taken, and he was asked if it could be ascertained from their books who was the purchaser of the cotton, and the number of pounds of cotton sold to the purchaser, and his reply was it could be done, but that it would take considerable labor to work it out from the books. After the libelants were required to answer the question as to the name and address of the purchaser of the good cotton and of the bad, they then answered that they did not know who it was, and were unable to give this information. This is manifestly untrue. Any business concern, dealing

in a commodity such as cotton, who buys it and sells it for a profit in these days of accurate bookkeeping, are necessarily able to trace any particular bale or lot of cotton so as to show, not only who they bought it from, but who they sold it to. There is a good deal of discussion in the testimony about whether or not the marks on the bales were destroyed, and some of the testimony shows that the marks on the bales were destroyed, and some of the testimony shows that the marks on the bales that were picked were not destroyed, so that the cotton could have been traced in that way, but, whether this was true or not, the lot of 300 bales could undoubtedly have been traced, and the purchaser of this lot of cotton could have been given, and then an examination of that purchaser could have been had so as to show the number of pounds of good cotton he bought from these libelants, and also their books should have shown who was the purchaser of the lot of damaged cotton taken out of these 300 bales. In that way the evidence could have been furnished to the court showing the total amount of good cotton, and the total amount of damaged cotton, so we could have had definite information as to the amount of cotton that was in fact damaged. Instead of doing that, libelants have relied solely upon the testimony of the two appraisers appointed by the Sea and Commerce Court, who give their estimate of the amount of damage.

■ There was produced to the court on the original hearing, the testimony of the libelant, of their auditor, and of these two examiners, appointed by the Sea and Commerce Court. The court being satisfied that libelant was entitled to some damage, but being uncertain as to the amount of damage because of this failure on the part of libelant to furnish definite information, ordered a reference instead of ascertaining the damage itself, and stated at the time that the court was uncertain from the evidence then introduced to it as to the amount of the damage, and that reference was ordered so that the libelant could secure and offer evidence showing definitely the amount of damage they had sustained. There was also offered before the court on this hearing oral testimony which showed that the cotton was wet when tendered to the steamer, and the facts as to what induced the steamer to issue clear bills of lading, and some testimony also as to the extent of the water damage, which showed that the water marks on one end of these bales were from an inch to an inch and a half deep. The cotton was all compressed. It also showed that for some week or ten days prior to the tender to the steamer the cotton was examined by the agent of Weil Bros., who made the agreement to indemnify the ship if they would issue clear bills, and that he took off the bagging from the wet end, exposing it to the air for the purpose of drying it out, and that he examined it each day to see how the drying was coming on. There could be no doubt, therefore, from this testimony that Weil Bros. knew the cotton was wet, and that they were not entitled to a clear bill of lading for it. So that, when they shipped it and induced the steamer to give a clear bill of lading, it was wrongfully done, and, when they collected the purchase price for this cotton on a clear bill of lading, which they knew they had no right to, that was wrongfully done. When the ship issued a clear bill of lading, knowing that the cotton was wet, and taking Weil Bros.' agreement to indemnify them against any wrong they might suffer by reason of issuing the clear bill, that was wrongfully done, so there can be no doubt that libelant was entitled to recover some damages in this case. On the other hand, when libelant, knowing what the estimate of the two examiners of the Sea and Commerce Court was, and knowing also that they had sold the cotton, they must have known also the weight of this good cotton, so that the difference between the weight of the good cotton and the weight of the bales as originally ascertained would show the amount of the damaged cotton. They must also have known that the estimate by these estimators gave them more than they were entitled to, or they would have furnished the other evidence. It is recognized by all courts that, when a party conceals evidence which is not accessible to his opponent, all adverse inferences are drawn because of that fact.

■ It is urged upon me in this case, however, that I must give weight to the master's report. This is ordinarily true, and it is usually put on the ground that the master has evidence taken before him which enables him to judge of the weight and sufficiency of this evidence from hearing it given, while the court only has the written copy testimony. In this case, the court was really in a better position in that respect than the master, because the only oral testimony offered was before the court, and the master had only written report of the oral testimony taken before the court. It has also been held that, while the testimony offered before the master was

written, and the same testimony was offered before the court, the force of the above rule is largely destroyed. Under the circumstances of this case, I do not feel that I am called on to give any special weight to the findings of the master. Further, because of the very fact that, when the order of reference was made, I called attention of counsel to the failure to disclose the name and address of the purchaser, and my confusion and uncertainty as to the amount of the damage because of the way the case was presented, and because of the further fact that on the hearing before the master no additional testimony was offered before him. So for these reasons I decline to give any weight to the report of the master, but will proceed to find an amount which at best will be only an approximation of the damages libelant is entitled to. I feel that in this case I should treat it as though it were a suit by libelant against Weil Bros., because the Shipping Board vessel made itself a party to Weil Bros.' wrongdoing by issuing, at their request, a clear bill of lading when they were not entitled to it. I can well conceive that cotton which had been standing in the water and was wet at least a week before it was shipped, and which was then packed tightly in the hold of the vessel, would, by reason of that fact, suffer considerably more damage by the time it reached Copenhagen than it had at the time of shipment. The bales were fifty-two inches long. The testimony of Mr. Sadler was that the water marks on these bales were from one inch to one and a half inches. Now if the water mark showed that the cotton had stood in water one inch or one and a half inches deep, naturally the absorption would go beyond water mark, so I fix libelant's damage at approximately 4 per cent. of the amount of cotton sold by Weil Bros. to the libelant. Of course, it would cost libelant something to have the cotton reconditioned, but also, the damaged cotton which they took out in order to recondition the bales would be worth something, and I estimate would be about worth what the cost of reconditioning the lot would be. The master who heard this case had no knowledge of the announcement the court made to counsel about the condition of the evidence showing damage, so in hearing the case he did not have the benefit of the court's expressions of doubt, and the court's request that additional evidence be furnished to clear up this doubt. The master erred in calculating the statutory interest in the state of Alabama, without noticing or having his attention called to the statute which makes the federal government liable for only 4 per cent. interest. 46 USCA § 743.

A decree will therefore be entered in favor of the libelant for 4 per cent. of the amount of the purchase price shown to have been paid by libelant to Weil Bros. for this cotton, plus 4 per cent. interest, amounting to $1,831.83.

If libelants recover less damages than they should, they have no one to blame but themselves, for, in an effort to speculate on the findings of the commission, they suppressed evidence that would have definitely ascertained the amount of their damage.